# United States Court of Appeals
## For the First Circuit

No. 02-1264

STEPHEN J. KEARNEY,

Plaintiff, Appellant,

v.

TOWN OF WAREHAM ET AL.,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. George A. O'Toole, Jr., U.S. District Judge]

Before

Selya, Circuit Judge,

Coffin, Senior Circuit Judge,

and Lipez, Circuit Judge.

Robert J. Murphy, with whom Holbrook & Murphy was on brief, for appellant.
Joseph L. Tehan, Jr., with whom Katharine Goree Doyle and Kopelman and Paige, P.C. were on brief, for appellees.

December 10, 2002

**SELYA**, **Circuit Judge**.  Plaintiff-appellant Stephen J. Kearney, a police officer, repeatedly took issue with his employer, the Town of Wareham (the Town), over the extent of the Town's obligations under the Fair Labor Standards Act, 29 U.S.C. §§ 201-219 (FLSA).  He asserts that the Town and its hierarchs, angered because he had prevailed in those disputes, cashiered him.  Claiming illegal retaliation, he sued the Town, its chief executive (Town Administrator Joseph Murphy), and two of his quondam superiors (Police Chief Thomas Joyce and Lieutenant Arthur J. Brightman).[1]  The district court disposed of the case on the defendants' motion for summary judgment.  Kearney v. Town of Wareham, Civ. No. 00-10115, 2002 WL 229690, at *4 (D. Mass. Feb. 1, 2002).  Kearney now appeals.  We affirm the judgment:  the FLSA does not constrain an employer who, despite harboring animosity

---

[1]Kearney's complaint invoked an FLSA provision that provides in pertinent part:

> [I]t shall be unlawful for any person . . . to discharge or in any other manner discriminate against any employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding under or related to this chapter . . . .

29 U.S.C. § 215(a)(3).  The individual defendants argued below that they were not Kearney's employers for purposes of the FLSA.  The district court found it unnecessary to rule on this issue.  See Kearney v. Town of Wareham, Civ. No. 00-10115, 2002 WL 229690, at *3 (D. Mass. Feb. 1, 2002).  We emulate the district court's example.

toward an FLSA suitor, makes employment decisions on other grounds
— and does so with due deliberation and objectivity.

## I.  BACKGROUND

We glean the relevant facts from the summary judgment
record, drawing all reasonable inferences in favor of the party
opposing brevis disposition (here, the plaintiff).  See Griggs-Ryan
v. Smith, 904 F.2d 112, 115 (1st Cir. 1990).

Wareham, Massachusetts, is a bucolic community known
largely as a gateway to Cape Cod.  Beginning in January of 1988,
Kearney served as a patrol officer and canine handler for the
Wareham Police Department.  As a canine handler, Kearney brought
his dog home each evening and provided essential care.  The Police
Department did not count the time spent ministering to the animal
as part of Kearney's 40-hour work week.

On May 17, 1994, Kearney and Todd Bazarewsky (a similarly
situated canine handler) demanded overtime compensation of up to
three hours per day for this work.  They also sought additional
overtime for transporting the dogs to and from the police station.
When the Town rejected these entreaties, the officers filed suit
under the FLSA.[2]  A trial ensued, and the jury found in Kearney's
favor.  Its verdict eventually translated into an award of $683.84
in damages, $2,346.81 in costs, and $34,589.00 in attorneys' fees.

----

[2]Bazarewsky later left the Wareham Police Department.  The
particulars of his situation are not relevant here, and we omit any
further mention of him.

-3-

The suit plainly left a bad taste in the mouths of Kearney's superiors. After the verdict but before the case was finally resolved, Chief Joyce circulated a memorandum entitled "Mandatory Overtime Reduction." This document, dated April 17, 1997, anticipated the final judgment and warned that the police force "must prepare to absorb the settlement costs of [Kearney's] lawsuit from the Department's budget." The memorandum then described the chief's plans to effectuate reductions in overtime assignments to free up the needed funds. Kearney claims that the money used to pay the judgment was not derived from the Police Department's budget[3] and that Chief Joyce's statements were calculated to pit Kearney against his fellow officers (who counted on overtime to supplement their income).

Kearney asserts that, as a result of the memorandum, his colleagues acted cooly toward him. Moreover, his allegation (in the course of the litigation) that the Town had acted in bad faith rankled, and Chief Joyce, among others, voiced suspicions that Kearney's victory had been procured by untruthful testimony.

From and after that point, Kearney's supervisors began paying particularly close attention to his job performance. This

---

[3]The record is clear that the payment did not emanate from the Police Department's budget (and, therefore, that the Department did not have to shrink overtime to defray this cost). Chief Joyce claims that he became aware of this circumstance only after he had circulated the memorandum. Kearney disputes this claim. Because we assume the existence of a retaliatory animus, see infra Part III, we need not resolve this factual dispute.

-4-

scrutiny resulted in two reprimands. The first, issued on May 28, 1997, was for failure to discover a break-in at a local restaurant during a patrol. The second, issued shortly thereafter, was for failing to clean his revolver. Kearney admits to the accuracy of the facts on which these reprimands were based but asserts (without offering specific examples to the contrary) that such infractions often were overlooked when committed by others. As an added slight, he was assigned what he described as "the oldest and most dilapidated" patrol car in the Police Department's fleet.

At some point in time — the record is silent as to the exact date — Kearney assumed the position of shop steward for the union that represented the rank and file members of the Wareham Police Department. In that capacity, he helped to bring two more FLSA claims against the Town. The first arose when the Police Department asked officers to remain available in case their services might be required during a predicted hurricane. Kearney argued that officers deserved compensation for the time that they spent at home awaiting a call to action. The other claim comprised an effort to secure compensation for police officers for training and roll-call time. In each instance, municipal officials found the claim to be meritorious and adjusted officers' compensation accordingly.

Not long after the last of these claims was settled, a series of events unfolded that marked the beginning of the end.

During the early morning hours of May 31, 1998, Kearney, while on patrol, found a bag of expensive golf clubs. Although standard procedure required officers to inventory lost property and either place it inside the evidence shed or ask a sergeant to secure it temporarily, Kearney eschewed these alternatives. Instead, he left the clubs next to the evidence shed (at the rear of the station house) without either logging them in or reporting that he had found them. He did, however, mention his discovery to a fellow officer, Dennis Damata.

The clubs vanished. They mysteriously reappeared twelve days later (after their owner had reported them lost). Kearney suspected that Damata had taken the clubs and said as much. When Damata learned of this aspersion, he complained to Lieutenant Brightman. After conferring with Chief Joyce, Brightman mounted an internal investigation.

Brightman interviewed several police officers and the owner of the golf clubs. He reported to Chief Joyce that he could not reach "a factual conclusion." He did, however, express the view that some of those interviewed were "being less than 100% truthful" and that criminal conduct likely had occurred. Emphasizing the disruptive effect of the incident, Brightman recommended that the probe continue and that the Police Department arrange polygraph tests for Kearney and Damata.

Both officers voluntarily agreed to undergo polygraph examinations, which were administered by an independent expert. The test results indicated that Damata was being truthful and Kearney was not. Chief Joyce immediately placed Kearney on administrative leave. He then wrote to Murphy on September 4, 1998, requesting the convening of a suspension hearing to look into Kearney's conduct. Acceding to this request, Murphy appointed Warren J. Rutherford, the Barnstable Town Administrator, as an independent hearing officer. Kearney did not object to the appointment.

Rutherford took testimony for four days over a period from September 18 through October 9, 1998. Kearney and several other police officers were among the witnesses. On October 15, 1998, Rutherford issued a detailed report in which he summarized the evidence, found that Kearney had violated departmental rules, and adjudged him guilty of "continued untruthful statements and conduct." On this basis, Rutherford recommended Kearney's immediate discharge. Four days later, Murphy adopted the hearing officer's recommendation and terminated Kearney's employment. The following day, Chief Joyce announced Kearney's termination in a letter to all police personnel, noting that "[e]mployees who are untruthful . . . will not be tolerated." At about the same time, in what amounted to an exit interview, Chief Joyce told Kearney: "you may have won the battle, but you didn't win the war." Not

unreasonably, Kearney interpreted this as a reference to his successful prosecution of FLSA claims.

Kearney appealed his termination to the Massachusetts Civil Service Commission (the Commission). On November 22, 1999, the Commission found Kearney guilty of "conduct unbecoming an officer" and noted that his behavior had caused "dissonance within the department." Withal, the Commission thought dismissal too severe a sanction and reduced the penalty to a sixty-day suspension. The state superior court affirmed the Commission's decision. See Wareham Police Dep't v. Kearney, No. 00-0224, slip op. at 7 (Mass. Super. Ct. Nov. 27, 2001). Judicial review ended at that point. The dismissal never actually took effect (although the sixty-day suspension presumably has been served).

In the meantime, Kearney had commenced the instant action. After the close of discovery, the defendants moved for summary judgment. The district court, in a thoughtful rescript, granted the motion. Kearney, 2002 WL 229690, at *4. This timely appeal followed.[4]

## II. THE SUMMARY JUDGMENT STANDARD

The role of summary judgment is "to pierce the pleadings and to assess the proof in order to see whether there is a genuine

---

[4]Murphy died on October 18, 2000. There has been no substitution of a party defendant, see Fed. R. Civ. P. 25(a); Fed. R. App. P. 43(a), and the plaintiff no longer presses his claims against the decedent.

need for trial." Garside v. Osco Drug, Inc., 895 F.2d 46, 50 (1st Cir. 1990) (quoting Fed. R. Civ. P. 56 advisory committee's note). Thus, summary judgment is appropriate as long as "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). Because appellate review of orders granting or denying summary judgment is plenary, Garside, 895 F.2d at 48, this court, like the district court, "must view the entire record in the light most hospitable to the party opposing summary judgment, indulging all reasonable inferences in that party's favor." Griggs-Ryan, 904 F.2d at 115.

Despite this generous perspective, summary judgment is not a hollow threat. Creating a genuine issue of material fact requires hard proof rather than spongy rhetoric. See Mesnick v. Gen. Elec. Co., 950 F.2d 816, 822 (1st Cir. 1991) (explaining that "[g]enuine issues of material fact are not the stuff of an opposing party's dreams"). Thus, though the party opposing a summary judgment motion enjoys a favorable presumption for the evidence he adduces, that evidence must be such that a reasonable factfinder could resolve the point in favor of the nonmoving party. United States v. One Parcel of Real Prop. (Great Harbor Neck, New Shoreham, R.I.), 960 F.2d 200, 204 (1st Cir. 1992).

Of course, not every documented factual dispute will avert the swing of the summary judgment axe. To achieve that end, the dispute must relate to a <u>material</u> fact. <u>See</u> <u>id.</u> In this context, "material" means that a fact has the potential of affecting the outcome of the case. <u>Id.</u> And as to issues on which the nonmoving party bears the burden of proof, "he must present definite, competent evidence to rebut the motion." <u>Id.</u>

## III.  ANALYSIS

We note, at the outset, that Kearney appears to have presented only a retaliatory termination claim to the district court. When queried on this point at oral argument in this court, Kearney's counsel had little to say. In a subsequent letter, <u>see</u> 1st Cir. R. 28(j), he identified those parts of the record that in his view reflect the assertion of additional claims. This endeavor offers no redemption.

Kearney's complaint makes only a single claim under the FLSA. The other cited materials chronicle Chief Joyce's memorandum and instances in which Kearney allegedly received disparate treatment, but these events are mentioned solely as part of the factual background of the case (presumably in an effort to show animus). Because they were not channeled into a clearly articulated claim, they have no standing here. <u>See</u> <u>McCoy</u> v. <u>Mass. Inst. of Tech.</u>, 950 F.2d 13, 22 (1st Cir. 1991) (explaining that

"theories not raised squarely in the district court cannot be surfaced for the first time on appeal") (collecting cases).

To cinch matters, Kearney repeats this omission on appeal: he makes no developed argument in support of any claim apart from retaliatory termination. That is an independently sufficient ground for forfeiture of other claims that may be lurking in the penumbra of his briefs. See United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990) (explaining that claims presented on appeal in a perfunctory manner, without developed argumentation, are deemed abandoned). Consequently, we focus exclusively on the retaliatory termination claim.

The defendants suggest that we evaluate this case under a burden-shifting framework. See St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 506-07 (1993); Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 252-56 (1981); McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-05 (1973). Because we assume, as did the district court, that the defendants harbored a retaliatory animus, see Kearney, 2002 WL 229690, at *3, the burden-shifting framework is inapposite. See Cardona Jimenez v. Bancomercio de P.R., 174 F.3d 36, 40 (1st Cir. 1999); Fennell v. First Step Designs, Ltd., 83 F.3d 526, 535 (1st Cir. 1996). Given the evidence of animus, this must be treated as a mixed-motive case.

We turn, then, to the proper method of analysis for such cases. To establish a prima facie claim of retaliatory

-11-

termination, Kearney must demonstrate his engagement in statutorily protected activity, the fact of his dismissal, and a causal connection between the former and the latter. See Hernandez-Torres v. Intercontinental Trading, Inc., 158 F.3d 43, 47 (1st Cir. 1998); Blackie v. Maine, 75 F.3d 716, 722 (1st Cir. 1998); Hoeppner v. Crotched Mtn. Rehab. Ctr., 31 F.3d 9, 14 (1st Cir. 1994). Here, the first two elements of the prima facie case plainly are present: Kearney's FLSA claims were protected by statute, see 29 U.S.C. § 215(a)(3), and there is no doubt that he was dismissed from his employment. The case turns, then, on whether the record, read in the light most favorable to Kearney, suffices to support an inference as to whether retaliatory animus was the "true reason or motive" for his dismissal. Hoeppner, 31 F.3d at 14.

Kearney has not made such a showing. While his dismissal followed closely upon the settlement of the final FLSA claim, that fact, standing alone, is not enough to trigger an inference of causation. Blackie, 75 F.3d at 723. More importantly, the record is pellucid that the defendants acted only after an evidentiary hearing conducted in such a way as to assure Kearney procedural fairness. The capstone of this process was a recommendation by an independent decisionmaker. Kearney has wholly failed either to discredit this process or to show that, but for the defendants' animus toward him, the recommendation would have been rejected.

We take the process step by step. As to the internal investigation, Kearney has presented no evidence suggesting that Brightman's probe was slanted or predisposed against him — and the record suggests precisely the opposite. For aught that appears, Brightman approached the investigation with an open mind and recommended nothing more than polygraph tests for both protagonists. Although Kearney cites several alleged flaws in Brightman's investigative technique (e.g., his failure to date a certain report, tape record the statements of some witnesses, or retain his personal notes), he adverts to nothing that calls into question the impartiality of the inquiry.

The polygraph tests comprise the next step. Kearney's suggestion that the tests were both improvidently worded and poorly administered does not advance his cause. The tests were constructed and administered by a fully accredited independent examiner who employed the same methodology for both protagonists. On this record, it is surpassingly difficult to fault the defendants for taking the polygraph results at face value.

This brings us to the hearing itself. While Kearney intimates that it was a kangaroo court, he fails to support his invective with an evidentiary predicate. Rhetoric alone will not suffice to prevent summary judgment, and, here, the facts are arrayed against Kearney. After all, he was represented by counsel at the hearing, and the ground rules ensured him ample opportunity

both to introduce evidence and to cross-examine adverse witnesses. Equally as important, he has adduced no proof of bias or partiality on the part of the independent hearing officer. See Kearney, 2002 WL 229690, at *3 n.3.

Kearney argues that neither the hearing officer nor the underlying procedure deserves deference because Murphy could have appointed an arbiter who was not neutral (or even assumed the role himself). But Murphy did not follow such a course here. And in all events, this argument is best directed to the Massachusetts legislature, which prescribed the procedures for dismissing civil servants. See Mass. Gen. Laws Ann. ch. 31, § 41 (West 2001). The record reflects that the Town took measured efforts to comply with Massachusetts law, and Kearney has offered no evidentiary support for the view that Rutherford (the designated hearing officer) was biased or partial.

The last step consists of Murphy's decision to accept, and act upon, that hearing officer's recommendation. In that regard, Kearney has offered nothing of probative weight to indicate that Murphy's acceptance of Rutherford's recommendation was other than a routine decision made in the ordinary course of Murphy's duties.[5] Moreover, the absence of any evidence that Murphy had

---

[5]Kearney cites the letter in which Chief Joyce announced the termination as an indication that the adoption of Rutherford's recommendation was more than a pro forma administrative action. The letter will not bear that weight. Although its language suggests that Chief Joyce had little affection for Kearney, we have

-14-

rejected independent hearing officers' recommendations in the past undermines Kearney's position. In a mixed-motive case for wrongful discharge, an employee cannot prevail unless he adduces some significantly probative evidence that he would not have been fired but for the proscribed animus. See, e.g., Randlett v. Shalala, 118 F.3d 857, 862 (1st Cir. 1997); Hoeppner, 31 F.3d at 14. Here, Kearney's termination was objectively justified, and Kearney has failed to produce any evidence suggesting that the firing was based on something other than this objective justification. Thus, the objective justification — the failed polygraph test, the hearing officer's findings, and the recommendation for dismissal — broke the causal link that Kearney sought to forge between the defendants' animus and his ouster.

The protection afforded by the FLSA's anti-retaliation provision is analogous to the protections that the First Amendment offers for employee speech. Accordingly, the conclusion that the investigation and hearing broke the causal link is reinforced by the Supreme Court's decision in Waters v. Churchill, 511 U.S. 661 (1994). The Waters Court addressed the practical problem of how a public employer may determine whether employee speech (or speech-

_____

already assumed the existence of such animosity. See text supra. At any rate, nothing about the letter impugns Murphy's actions.

Kearney also asserts that this letter was disseminated before he was told of his firing, and suggests that the timing somehow shows connivance. This assertion also fails, as the summary judgment record does not support Kearney's premise.

-15-

related conduct) may be used as a basis for an adverse employment action.  Id. at 677-78 (plurality op.).  The Court held that the employer may rest such an action on evidence produced in an internal investigation so long as the findings gleaned from the investigation are facially reasonable and drawn in good faith.  Id. at 677.[6]  This holding strongly suggests that although the Town must justify Kearney's dismissal by reference to non-retaliatory reasons, those reasons may rest on evidence obtained from an internal investigation if (and to the extent that) the Town's factual conclusions are facially reasonable and arrived at in good faith.  The Town easily clears this hurdle:  Lieutenant Brightman's investigation, the subsequent polygraph tests, and a procedurally fair hearing before an independent decisionmaker generated facially reasonable conclusions supporting Kearney's discharge, and there is no significantly probative evidence suggesting that bad faith sullied the investigation, the hearing, the recommendation, or Murphy's acceptance of the recommendation.

Kearney tries to repair this broken causal link in two ways.  First, he points to the Commission's mitigation of his firing.  We fail to grasp the relevance of the Commission's

---

[6]Although this holding is found in the opinion of a four-member plurality, three concurring Justices would have placed a lesser burden on the employer.  Thus, the plurality's reasonableness requirement has the force of law.  See id. at 685 (Souter, J., concurring) ("A majority of the Court agrees that employers whose conduct survives the plurality's reasonableness test cannot be held constitutionally liable . . . .").

determination. The Town was entitled to rely on the facially reasonable decision of the independent hearing officer while that decision was in force, and the subsequent modification of that decision by a higher authority does not, in and of itself, imply bad faith. See, e.g., Singh v. Blue Cross/Blue Shield of Mass., Inc., 308 F.3d 25, 41 (1st Cir. 2002) (holding that the reversal of a peer review committee's recommendation does not indicate that the recommendation was made in bad faith). In all events, although the Commission reduced Kearney's dismissal to a sixty-day suspension, it agreed with the hearing officer that Kearney's conduct was unbecoming an officer and warranted some meaningful form of discipline.

Kearney's second effort is equally unavailing. He asserts that he was hailed as a model police officer before he began pursuing FLSA claims and asseverates that the Town's willingness to cashier him indicates that the adverse employment decision was driven by retaliatory animus. Even if Kearney's characterization of his prior record is accurate, the conclusion that he seeks to draw does not follow. Courts must act with a certain restraint when examining an employer's personnel decisions. See Mesnick, 950 F.2d at 825 ("Courts may not sit as super personnel departments, assessing the merits — or even the rationality — of employers' nondiscriminatory business decisions."); see also Fennell, 83 F.3d at 537 (discounting a

-17-

plaintiff's argument that her distinguished past performance suggested that her employer's nondiscriminatory justifications were pretextual). Our inquiry is not whether the Town's decision was wise, but, rather, whether it violated the FLSA's anti-retaliation provision. On this record, the defendants' proffered justification for Kearney's termination negates any conclusion that retaliatory animus was a driving force.

We summarize succinctly. Kearney had to proffer evidence sufficient to ground an inference that the defendants' actions were not based on legitimate justifications, but, rather, that their stated reasons for ousting him were invoked merely as a pretext.[7] See Gray v. New Engl. Tel. & Tel. Co., 792 F.2d 251, 256 (1st Cir. 1986). Given the procedural safeguards that attended the evidentiary hearing, there is no basis — short of sheer speculation — for a finding that the defendants believed that accepting, and acting upon, the hearing officer's recommendation was unjustified. Even if we assume, as Kearney urges, that the defendants were gratified by having an opportunity to rid themselves of a gadfly who had demonstrated a penchant for using the FLSA as a sword against them, that is not enough to ground a retaliation claim.

---

[7]This focus on the credibility of the defendants' justification for the adverse employment action mitigates the force of Chief Joyce's statement to Kearney in the exit interview. Even if Kearney accurately characterizes both the substance and the meaning of Chief Joyce's comment, quoted supra at 7, the comment does not directly address (let alone impugn) the substance of the proffered justifications.

See Champagne v. Servistar Corp., 138 F.3d 7, 13 (1st Cir. 1998) (holding that the existence of a retaliatory motive cannot overcome a showing that an employee's dismissal resulted from a plainly neutral test, applied even-handedly); DeNovellis v. Shalala, 135 F.3d 58, 66 (1st Cir. 1998) (denying relief to an employee despite a showing of personal animosity because the "animus did not cause [the employee] to be treated any differently than her similarly situated co-workers"); cf. Blackie, 75 F.3d at 723-24 (explaining that an employee, "by engaging in a protected activity [under the FLSA], . . . does not acquire immunity" from the same discipline to which his co-workers are subject). In short, Kearney had to adduce some significantly probative evidence that the defendants' retaliatory animus played a materially causal role in the termination of his employment. He did not do so.

## IV. CONCLUSION

We need go no further. For the reasons discussed above, we conclude that the district court did not err in entering summary judgment in favor of the defendants.


**Affirmed**.

-19-