# United States Court of Appeals
## For the First Circuit

No. 14-1943

DENISE MURRAY,

Plaintiff, Appellant,

v.

KINDRED NURSING CENTERS WEST LLC,
d/b/a Kindred Transitional Care and Rehabilitation-Kennebunk,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MAINE

[Hon. Jon D. Levy, U.S. District Judge]

Before

Lynch, Chief Judge,
Torruella and Selya, Circuit Judges.

Guy D. Loranger, with whom Law Office of Guy D. Loranger was
on brief, for appellant.
James R. Erwin, with whom Michelle Y. Bush and Pierce Atwood
LLP were on brief, for appellee.

June 10, 2015

**SELYA, Circuit Judge.** Denise Murray portrays herself as a whistleblower and charges that her quondam employer, Kindred Nursing Centers West LLC (Kindred), fired her on that account. Kindred denies this charge, asserting that it terminated Murray's employment for a legitimate, nondiscriminatory reason: suspected drug diversion. The district court assiduously sorted through the evidence supporting these dueling allegations and entered summary judgment in favor of Kindred. After careful consideration, we affirm.

## I. BACKGROUND

We rehearse the relevant facts in the light most favorable to the plaintiff, drawing all reasonable inferences to her behoof. See Kearney v. Town of Wareham, 316 F.3d 18, 19 (1st Cir. 2002).

During the relevant time frame, Kindred operated a nursing facility in Kennebunk, Maine, offering short-term and long-term rehabilitation care. In March of 2011, Kindred hired Murray as a licensed practical nurse. On four occasions during the first three months of 2012, Murray claims to have reported concerns about one of her supervisors (a registered nurse whom we shall call Melissa Doe). According to Murray, Doe sometimes appeared to be under the influence of drugs while on duty and once had admitted

-2-

taking a "Xanabar" before coming to work.[1]  Murray also claims to have reported that Doe once asked to be the person assigned to "take care of" oxycodone that needed to be destroyed.

Murray claims to have made these reports to Kindred's director of nursing, Dawn Guptill, and Murray says that Guptill agreed to look into her allegations.  In response to her last report, Murray says that Guptill "snapped" at her and stated "I will handle it my own way."  Guptill denies much of Murray's account, and there is no written record either of Murray's complaints or of an investigation by Guptill.

On March 9, 2012 (about a week after the fourth report), Guptill met with Bethany Gage (a nurse who worked at the facility). Gage informed Guptill that Murray had documented administering oxycodone (a powerful pain medication) to Resident 1 the previous day when, to Gage's knowledge, Resident 1 had not been in pain for quite some time.[2]  Gage further noticed that Murray had documented administering oxycodone to Resident 1 on several occasions over the previous few weeks even though no other nurse had done so.  When Gage asked Resident 1 if he either had been in pain or had received pain medication lately, he replied in the negative.

---

[1] According to Murray, "Xanabar" is a slang term denominating four Xanax pills taken together.

[2] To protect the patients' privacy, we refer to them — as did the district court — by number rather than name.

After receiving this distressing news, Guptill surveyed other patients' records. Upon inquiry, Resident 2 denied having received oxycodone at the time Murray had recorded administering it to him. Guptill similarly learned that Murray had documented administering medication to Resident 3 several hours after Resident 3 had been discharged from the facility. On another occasion, after medication was "punched in error," Murray failed either to indicate what was done with the medication or to obtain the required second signature of a witness to its destruction. Guptill discovered other irregularities as well: for example, Murray listed a February 2 administration of medication beneath entries describing medication administrations on February 3 and February 4 — a sequence demonstrating that Murray's February 2 note was entered at least two days in arrears. On another patient's chart, Murray had altered the time of administration of a drug by an hour. And, finally, Murray's signature varied widely within and between documents and was sometimes totally illegible.

Within a matter of hours after speaking with Gage, Guptill had concluded that Murray was diverting drugs from patients. Guptill promptly informed Murray that she was terminated for drug diversion. Murray denied the charge and requested a meeting, but Guptill refused to see her.

As required by law, Guptill reported Murray's dismissal to the Maine State Board of Nursing (the Board) and the suspected

drug diversion to the Maine Department of Health and Human Services (DHHS). See Me. Rev. Stat. tit. 24, § 2506; 10-144-110 Me. Code R. § 17.D.10. Murray entered into a consent agreement with the Board in which she admitted that she was properly disciplined for "illegible and substandard documentation, particularly concerning narcotic administration" in violation of state law and Board rules. DHHS's investigation into the matter proved inconclusive, although it noted that medication errors persisted at the facility even after Murray's discharge.

After these administrative proceedings wrapped up, Murray repaired to a state court and accused Kindred of violating Maine's Whistleblowers' Protection Act (WPA), Me. Rev. Stat. tit. 26, §§ 831-840. The gravamen of her suit was an allegation that Kindred had cashiered her for complaining about Doe. Citing diversity of citizenship and the existence of a controversy in the requisite amount, Kindred removed the action to the federal district court. See 28 U.S.C. §§ 1332(a), 1441.

During pretrial discovery, it came to light that Murray had filed for bankruptcy in 2009 but had not amended the appropriate bankruptcy schedule to disclose her whistleblower claim as an asset. See 11 U.S.C. § 521(a)(1)(B)(i); see also id. §§ 541(a)(7), 1306(a)(1). Kindred later moved for summary judgment on two grounds. It maintained that Murray's failure to schedule her claim in the bankruptcy court judicially estopped her from

-5-

suing on that claim, see, e.g., Guay v. Burack, 677 F.3d 10, 17 (1st Cir. 2012); and in all events, that Murray's claim failed on the merits. The district court rejected Kindred's judicial estoppel theory but granted summary judgment on the merits in its favor. See Murray v. Kindred Nursing Ctrs. W. LLC, No. 13-341, 2014 WL 4411044 (D. Me. Sept. 8, 2014). The court premised its ruling on Murray's failure to make out a trialworthy issue on her claim that Kindred had ousted her because of her role as a whistleblower. See id. at *9-11. This timely appeal ensued.

## II. ANALYSIS

Summary judgment is "a means of avoiding full-dress trials in unwinnable cases, thereby freeing courts to utilize scarce judicial resources in more beneficial ways." Mesnick v. Gen. Elec. Co., 950 F.2d 816, 822 (1st Cir. 1991). We review the district court's disposition of a summary judgment motion de novo, "scrutiniz[ing] the evidence in the light most agreeable to the nonmoving party, giving that party the benefit of any and all reasonable inferences." Noviello v. City of Bos., 398 F.3d 76, 84 (1st Cir. 2005). To prevail, the movant must demonstrate that "there is no genuine dispute as to any material fact" and that it "is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

Consistent with this praxis, the nonmovant can forestall summary judgment by "present[ing] definite, competent evidence"

-6-

demonstrating the existence of a genuine dispute about a material fact. Mesnick, 950 F.2d at 822. Such evidence must be sufficiently probative that, if it is credited, a factfinder could resolve the case in favor of the nonmovant. See Kearney, 316 F.3d at 22. "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986).

Against this backdrop, we turn to the legal structure underlying Murray's claim. The WPA prohibits discrimination against an employee who makes a good-faith report of, among other things, "a condition or practice that would put at risk the health or safety of" any person. Me. Rev. Stat. tit. 26, § 833(1)(B); see id. § 833(1)(E) (providing protection for employees who report "an act or omission that constitutes a deviation from the applicable standard of care for a patient by an employer charged with the care of that patient"). Maine law provides a private right of action for a violation of the WPA. See id. tit. 5, §§ 4572(1)(A), 4621; see also Costain v. Sunbury Primary Care, P.A., 954 A.2d 1051, 1053 & n.2 (Me. 2008).

With respect to claims brought pursuant to the WPA, Maine courts employ the familiar three-part McDonnell Douglas framework. See Stanley v. Hancock Cnty. Comm'rs, 864 A.2d 169, 174 (Me. 2004)

(citing McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973)).  Under that framework, the plaintiff must make out a prima facie case through a showing that "(1) she engaged in activity protected by the WPA; (2) she experienced an adverse employment action; and (3) a causal connection existed between the protected activity and the adverse employment action."  Walsh v. Town of Millinocket, 28 A.3d 610, 616 (Me. 2011).  Once this prima facie showing is made, the burden shifts to the defendant to "produce some probative evidence to demonstrate a nondiscriminatory reason for the adverse employment action." DiCentes v. Michaud, 719 A.2d 509, 515 (Me. 1998).  When that light burden of production is met, the burden shifts back to "the employee to persuade the factfinder that there was, in fact, a causal connection between the protected activity and the adverse employment action."  Id.

In the case at hand, Murray made out her prima facie case.  She reported a supervisory nurse for behavior indicative of impairment, thereby engaging in a protected activity; she experienced an adverse employment action (the loss of her job); and those two events occurred in a relatively compact time frame. Under Maine law, close temporal proximity between the protected activity and the adverse action is a sufficient showing of causation for the purpose of establishing a plaintiff's prima facie case.  See Stanley, 864 A.2d at 175.  This put the ball in Kindred's court, and Kindred identified a legitimate,

-8-

nondiscriminatory reason for firing Murray: suspected drug diversion. Thus, the case — at the summary judgment stage — boiled down to whether Murray adduced sufficient evidence to support a finding that drug diversion was a pretext and, concomitantly, that her claimed whistleblowing activity "was the 'true reason or motive' for [her] dismissal." Kearney, 316 F.3d at 23 (quoting Hoeppner v. Crotched Mt. Rehab. Ctr., Inc., 31 F.3d 9, 14 (1st Cir. 1994)).

The district court thought not, see Murray, 2014 WL 4411044, at *9-11, and we agree. "To demonstrate a causal link, the plaintiff must show that the protected activity (whistleblowing) 'was a substantial, even though perhaps not the only, factor motivating the employee's dismissal.'" Caruso v. Jackson Lab., 98 A.3d 221, 226 (Me. 2014) (quoting Walsh, 28 A.3d at 616-17). Put simply, "her protected whistleblowing activity must be a but-for cause of the employer's decision to terminate the employment." Id. at 227.

Appraisal of the record as a whole discloses an absence of any significantly probative evidence sufficient to support a finding that Murray's firing would not have occurred but for her whistleblowing activity. Murray admitted to the Board that her documentation practices violated state law and fell well below professional standards. What is more, she does not meaningfully contest that the problems identified by Guptill in her

-9-

investigation might have led Guptill to believe (or, at least, to suspect) that Murray was engaged in drug diversion. Drug diversion in a nursing home is a serious matter, and — given Guptill's supportable findings — Murray's discharge was not only objectively justified but also inevitable. See Kearney, 316 F.3d at 24. Once those findings were in hand, it is hard to imagine how Murray's employment could have endured.

In an effort to blunt the force of this reasoning, Murray strives to show that Guptill's drug diversion rationale was a pretext. To this end, she assembles an array of facts designed to show pretext. At the outset, Murray notes that she was terminated for "drug diversion" but that, in the course of this litigation, Kindred cited "suspected drug diversion" as the reason for her termination. In her view, this shifting rationale evidenced pretext. See, e.g., Domínguez-Cruz v. Suttle Caribe, Inc., 202 F.3d 424, 432 (1st Cir. 2000). But in this case, the distinction between "drug diversion" and "suspected drug diversion" is without a difference. Both descriptions capture the same notion, which Kindred has consistently articulated: at the time of Murray's firing, Kindred reasonably concluded that she engaged in drug diversion. Whether she actually diverted drugs is of no moment.

Kindred's reasonable suspicion was sufficient to justify terminating Murray's employment.[3]

In a similar vein, Murray submits that because there is no direct proof that she actually diverted drugs, a rational jury could conclude that Kindred fired her for some reason unrelated to drug diversion. See Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 147 (2000) (noting that, in some circumstances, the falsity of a proffered explanation may give rise to an inference "that the employer is dissembling to cover up a discriminatory purpose"). In support, she labors to explain away each piece of evidence upon which Guptill relied: the two patients who denied receiving medication were not always lucid; some of the seemingly irregular entries may have been misread by Guptill; and other irregular entries were indicative only of careless recordkeeping. In addition, Guptill's investigation spanned only a few hours and did not include any input from Murray. Consequently, the investigation signaled a "rush to judgment."

Admittedly, Murray's parsing of the evidence may suffice to create a genuine factual dispute about whether she actually diverted drugs. But that is beside the point: evidence of a decisionmaker's mistaken judgment is not dispositive of the question of pretext unless that evidence would permit the

_____

[3] We add, moreover, that this is quite plainly a tempest in a teapot. Contemporaneous reports written by Guptill refer to "suspected drug diversion" as the basis for her actions.

factfinder to conclude that the stated nondiscriminatory justification for the adverse employment action was either knowingly false or made in bad faith. See Jordan v. Summers, 205 F.3d 337, 343 (7th Cir. 2000) ("In order to show pretext, [the plaintiff] must demonstrate that [the defendant's] proffered reason is a lie or completely lacks a factual basis." (footnote omitted)); see also Morgan v. Mass. Gen. Hosp., 901 F.2d 186, 191 (1st Cir. 1990). Here, then — even assuming for argument's sake that Murray never actually diverted drugs — Murray has proffered no evidence sufficient to support an inference that Guptill was unjustified in believing that she did. Nor has she proffered any evidence sufficient to support an inference that a more thorough investigation would have led to that conclusion. The short of it is that nothing in this record suffices to support a finding of either knowing falsity or bad faith. Casting aspersions is not enough. See Medina-Munoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir. 1990).

Murray soldiers on. She claims that Guptill's treatment of her, as compared to Doe, constitutes evidence of pretext. In support, Murray notes that there is no record of any investigation of Doe's alleged drug use despite Murray's multiple reports; yet when Murray was reported for drug diversion, Guptill's reaction was swift and decisive.

We agree with Murray's premise: in appropriate circumstances, pretext may be inferred from proof that similarly situated employees "were not discharged while the plaintiff was." Morgan, 901 F.2d at 191. However, we disagree with Murray's ipse dixit that she and Doe were similarly situated. "No valid comparison can be drawn between two incidents for the purpose of proving disparate treatment if 'differentiating or mitigating circumstances' distinguish either the employee's conduct or the employer's response to it." Conward v. Cambridge Sch. Comm., 171 F.3d 12, 21 (1st Cir. 1999) (quoting Perkins v. Brigham & Women's Hosp., 78 F.3d 747, 751 (1st Cir. 1996)). So it is here: Doe was suspected of drug use, while Murray was suspected of drug diversion.

We do not doubt that drug use by a nurse is a consequential matter. But the means, mode, and method of investigating suspected drug use are considerably more complicated than those available for investigating suspected drug diversion (in the latter instance, as here, a simple check of records often will suffice). Moreover, both state regulations and company policy recognize drug diversion as a problem uniquely worthy of prompt investigation and decisive sanction (up to and including dismissal).

Specifically, state regulations required Kindred to notify DHHS within 72 hours "when there is suspicion that a

-13-

medication has been tampered with or stolen," and this notification must be followed by a written report. 10-144-110 Me. Code R. § 17.D.10 (emphasis supplied). State law imposed no similar notification-and-report requirement on Kindred for suspected drug use by employees.[4]

This distinction is also borne out by Kindred's employee handbook (the Handbook), which places great emphasis on the seriousness of diverting drugs from patients. The Handbook states that "Kindred will take disciplinary action, up to and including separation of employment, when it has a reasonable belief that an employee has sought to obtain medications from the facility that are intended for resident use." There is no comparable provision relating to drug use: although the Handbook expressly prohibits employees from working while under the influence of alcohol, drugs, or medication, it contains no parallel provision mandating discipline.

In a last-ditch effort to salvage her differential treatment argument, Murray makes two additional points. First, she suggests that other nurses' signatures varied or were illegible,

---

[4] The record does not bear out Murray's belated attempt to characterize her complaints about Doe as complaints involving both drug use and drug diversion. Although she reported that Doe invited her on one occasion to let Doe "take care of" oxycodone that needed to be discarded, Murray declined that invitation and the oxycodone was appropriately destroyed. No matter how one characterizes this incident, it was not the type of incident that required DHHS notification and reporting.

-14-

yet those nurses suffered no discipline.  The record contains no evidence, though, that any of these signature-related problems in any way implicated drug diversion or otherwise violated either state law or company policy.

Second, Murray suggests that Guptill's failure to investigate another nurse who documented administering drugs to Resident 2 when he was allegedly not in pain is evidence of differential treatment.  This suggestion confuses Resident 2 with Resident 1.  Resident 1 denied experiencing pain; Resident 2 only denied receiving medication at the time that Murray — not the other nurse — recorded its administration.

## III.  CONCLUSION

We need go no further.[5]  In the last analysis, Murray's litigation position hinges on her insistence that Guptill was looking for a reason to rid herself of Murray and her complaints.  But under Maine law, proof of retaliatory animus alone does not suffice to demonstrate the causal connection required to make out a claim for whistleblower protection.  See DiCentes, 719 A.2d at 516; see also Kearney, 316 F.3d at 25-26.  In other words, "by engaging in a protected activity an employee does not acquire

---

[5] This appeal was consolidated for argument with Appeal No. 14-2072.  The latter is an appeal by Kindred (probably an unnecessary precaution) from the district court's rejection of its judicial estoppel theory. See Murray, 2014 WL 4411044, at *7.  We do not reach the judicial estoppel issue and, by separate order, we today dismiss that appeal as moot.

immunity from the same risks that confront virtually every employee every day in every work place."  <u>Blackie</u> v. <u>Maine</u>, 75 F.3d 716, 723-24 (1st Cir. 1996).  At a minimum, the plaintiff must "adduce some significantly probative evidence that the [defendant's] retaliatory animus played a materially causal role in the termination of [her] employment."  <u>Kearney</u>, 316 F.3d at 26.  Here, there is nothing from which a reasonable factfinder could infer that Murray's firing would not have occurred but for her whistleblowing activity.

**<u>Affirmed</u>.**