# United States Court of Appeals
## For the First Circuit

No. 17-1717

PATRICIA THERIAULT,

Plaintiff, Appellant,

v.

GENESIS HEALTHCARE LLC,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

[Hon. George Z. Singal, U.S. District Judge]

Before

Howard, Chief Judge,
Selya and Barron, Circuit Judges.

Guy D. Loranger, with whom Danielle M. Campbell and Law Office of Guy D. Loranger were on brief, for appellant.
James R. Erwin, with whom Elizabeth B. Rao and Pierce Atwood LLP were on brief, for appellee.

May 16, 2018

**SELYA**, **Circuit Judge**.   Plaintiff-appellant Patricia Theriault bills this case as one in which the district court ignored the teachings of the Maine Supreme Judicial Court (known in its appellate capacity as the Law Court) and improperly relied on the McDonnell Douglas framework, see McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), when granting her employer's motion for summary judgment.   At first blush, this billing seems to suggest a nuanced question as to whether the McDonnell Douglas framework is procedural (and, thus, should be applied by a federal court when adjudicating a state-law cause of action in a diversity case, regardless of whether the state court would apply it) or substantive (and, thus, should not be applied by a federal court when adjudicating a state-law cause of action in a diversity case, so long as a state court would not apply it).   See Gasperini v. Ctr. for the Humanities, 518 U.S. 415, 427 (1996); Hanna v. Plummer, 380 U.S. 460, 465-66 (1965).   Appearances can be deceiving, though, and the presumed need to answer this nuanced question vanishes upon a careful reading of the Maine cases: the district court did not rely on the McDonnell Douglas framework but, rather, followed the prescriptions of the Law Court, went directly to the issue of whether Theriault had made out a cognizable claim for retaliation under state law, and determined that she had not.   See Theriault v. Genesis HealthCare LLC, No. 15-cv-530, 2017 WL 1403162, at *8 (D. Me. Apr. 19, 2017).   We

- 2 -

affirm, leaving the inquiry into the procedural/substantive dichotomy for another day.

## I.  BACKGROUND

We glean the facts from the summary judgment record. Theriault, a certified nursing assistant (CNA), began working in 1997 at RiverRidge, a nursing facility located in Kennebunk, Maine, licensed by the Maine Department of Health and Human Services (DHHS).  The defendant, Genesis HealthCare LLC (Genesis), is the parent company of Kennebunk Operations LLC, which owns and operates RiverRidge.  Most of the patients at RiverRidge are in assisted living, and many suffer from neurological deficits.  As a licensed nursing facility, RiverRidge is required by law to report any allegations of patient abuse as soon as it learns of them.  See Me. Rev. Stat. Ann. tit. 22, § 3477(1).

Theriault worked at RiverRidge alongside Cheyenne Wagner, who was both a CNA and a certified residential medication assistant.  On November 11, 2014, Wagner approached Elizabeth Moore, the director of human resources at RiverRidge, to complain about Theriault peering into Wagner's purse and asking what medications she was taking.  Wagner also lamented that Theriault had engaged in harassing behavior on Facebook.  As a result of Wagner's complaint, Theriault was reassigned to a different unit so that the two women would not have to work together.

Six days later, Theriault asked Moore why her work schedule had been changed. Moore did not mention Wagner's complaints but simply told Theriault that employee schedules varied based on staffing needs in particular areas. During this conversation, Theriault griped about Wagner, expressing her view that Wagner had been rude because Wagner had refused to discuss personal problems while at work. Moore cautioned Theriault against trying to engage in personal conversations in the workplace.

Theriault then approached Sarah Louise Corson, the director of nursing at RiverRidge, to remonstrate about Wagner. Corson responded that she had no time for a meeting and asked Theriault to submit her grievances in writing.

Moore and Corson worried that Theriault's conflict with Wagner might lead Wagner to leave RiverRidge. On November 20, 2014, Moore, Corson, and Robert Straznitskas (RiverRidge's administrator) met with Wagner to discuss her concerns. Wagner brought a handwritten note to the meeting, listing several incidents of worrisome behavior on Theriault's part. For instance, Wagner's note mentioned seeing Theriault grab a resident by the front of his shirt and shake him. It also mentioned several untoward comments allegedly made by Theriault. One time, Theriault had asked another coworker for a gun "to handle" a difficult resident. On another occasion, Theriault asked a pharmacy employee if he had a baseball bat to use on a resident. Similarly, Theriault

- 4 -

once told the family of a resident that she had "a noose and a bucket" ready for his use. Wagner reported that this statement was very upsetting to the family.

The management team (Corson, Moore, and Straznitskas) found Wagner's account troubling and thought that the incident in which Theriault was said to have shaken a resident might well amount to patient abuse.[1] As required by RiverRidge policy, Corson reported the incident to DHHS, and Theriault was immediately suspended pending an investigation. In addition, Corson scheduled a meeting with Theriault for the next day to discuss the insights furnished by Wagner. According to Theriault, she was not told of the allegations against her and assumed that she would be meeting to discuss her grievances against Wagner.

When she showed up for the scheduled meeting, Theriault brought with her a written summary of her concerns regarding Wagner's workplace behavior. The summary described several episodes in which Wagner supposedly was rude to Theriault, including once when Theriault asked if "anything was going on that I should know about" to which Wagner responded "no not really" in a "very rude[]" manner. Theriault's summary also complained that, as Wagner "walked by [Theriault,] she turned away and stuck her

---

[1] In Maine, patient "abuse" is defined as "the infliction of injury . . . or cruel punishment that causes or is likely to cause physical harm or pain or mental anguish." Me. Rev. Stat. Ann. tit. 22, § 3472(1).

- 5 -

nose up in the air."  Later that same evening, Wagner responded rudely when Theriault asked her if she was going on a break.  After Wagner returned in about twenty minutes, Theriault thought that she was in a much more pleasant mood.[2]

Theriault also wrote that she had observed Wagner texting on her cell phone "many times" while distributing medications.  Texting while distributing medications is (for obvious reasons) considered unsafe and is prohibited by RiverRidge policies.

Corson, Straznitskas, and a Genesis executive were in attendance at the November 21 meeting.  They perused Theriault's written summary, but quickly turned to the allegations that had earlier been leveled against her.  Theriault acknowledged that she may have made the three statements attributed to her by Wagner, but insisted that they were made in jest.  With respect to the claim that she had shaken a resident, she conceded that she might have grabbed him by the front of his shirt but only to prevent him from falling.

Moore and Corson investigated the allegation that Theriault had shaken the resident.  They interviewed the resident himself (who has a serious brain injury and memory loss) as well

---

[2] Theriault now claims that this behavior led her to suspect that Wagner was abusing drugs.  Such a claim, however, comes as a bolt from the blue:  Theriault never mentioned such a suspicion to management at any time during her tenure at RiverRidge.

as his roommates, but unearthed no corroboration. They also interviewed Rosa Vasquez (a CNA), who stated that she had seen Theriault grab the resident by the shirt and shake him during a moment of frustration while moving the resident into his wheelchair. Vasquez intervened, told Theriault to take a break, and completed the transfer. She did not report the incident contemporaneously, but told Wagner about it at a later date.

Moore and Corson found Vasquez's account to be credible and concluded that Theriault had grabbed the resident in a "non-clinical manner." They also concluded that she had made the three highly inappropriate statements attributed to her by Wagner. Citing these four findings, Moore asked the company's regional headquarters for permission to fire Theriault. That permission was forthcoming, and Theriault was terminated on November 25, 2014. The DHHS subsequently conducted its own investigation into the shaking incident and determined that no patient abuse had occurred.

Theriault did not go quietly into this bleak night. Asserting that her dismissal was in retaliation for her complaints against Wagner, she filed a claim with the Maine Human Rights Commission and received a right-to-sue letter. See Me. Rev. Stat. Ann. tit. 5, § 4612. She then proceeded to invoke diversity jurisdiction, see 28 U.S.C. § 1332(a), and sued Genesis in Maine's

federal district court.[3] Her complaint alleged that Genesis had flouted the Maine Whistleblower Protection Act (WPA), Me. Rev. Stat. Ann. tit. 26, § 833, and had defamed her. Following extensive pretrial discovery, Genesis moved for summary judgment. See Fed. R. Civ. P. 56(a). The district court determined that Theriault had failed to make out genuine issues of material fact sufficient to bring either of her causes of action to trial. See Theriault, 2017 WL 1403162 at *9, *10.

This timely appeal ensued. In it, Theriault challenges only the adverse judgment on her WPA claim.

## II. ANALYSIS

"The role of summary judgment is to pierce the pleadings" and probe the proof to ascertain whether a need for trial exists. Kearney v. Town of Wareham, 316 F.3d 18, 21 (1st Cir. 2002). Our review of the district court's entry of summary judgment is plenary, and we must take the facts in the light most hospitable to the nonmoving party, "indulging all reasonable inferences in that party's favor." Griggs-Ryan v. Smith, 904 F.2d 112, 115 (1st Cir. 1990). Summary judgment is appropriate when the evidence of record "show[s] that there is no genuine issue as to any material

---

[3] Although Genesis is the sole defendant named in this action, it has not questioned Theriault's allegation that it should be treated as her employer in connection with her WPA claim.

fact and that the moving party is entitled to judgment as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

A swing of the summary judgment axe can be averted if the nonmoving party adduces competent evidence demonstrating the existence of a genuine dispute about a material fact. See Murray v. Kindred Nursing Ctrs. W. LLC, 789 F.3d 20, 25 (1st Cir. 2015). "Such evidence must be sufficiently probative that, if it is credited, a factfinder could resolve the case in favor of the nonmovant." Id. An inquiring court is not obliged either "to draw unreasonable inferences or credit bald assertions [or] empty conclusions." Cabán Hernández v. Philip Morris USA, Inc., 486 F.3d 1, 8 (1st Cir. 2007); see Medina-Munoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir. 1990).

With this rudimentary backdrop in place, we turn first to the analytic framework that governs the analysis of Theriault's WPA retaliation claim. We then consider the merits.

## A. The Analytic Framework.

Sitting in diversity jurisdiction, a district court is obliged to apply state substantive law and federal procedural law. See Gasperini, 518 U.S. at 427. In this case, the parties agree that Maine law supplies the substantive rules of decision.

The WPA prohibits retaliation against an employee who makes a "good-faith report of . . . 'a condition or practice that would put at risk the health or safety of' any person." Murray,

- 9 -

789 F.3d at 25 (quoting Me. Rev. Stat. Ann. tit. 26, § 833(1)(B)). Maine law confers a private right of action for a violation of this statutory imperative. See id. To prevail on a WPA claim, the plaintiff must demonstrate that "(1) she engaged in activity protected by the WPA; (2) she experienced an adverse employment action; and (3) a causal connection existed between the protected activity and the adverse employment action." Walsh v. Town of Millinocket, 28 A.3d 610, 616 (Me. 2011).

In the case at hand, the first two of these predicate elements are not in dispute. Theriault's complaint that Wagner was texting while distributing medications is plainly protected activity in the form of a report about a "practice that would put at risk the health or safety" of the residents, Me. Rev. Stat. Ann. tit. 26, § 833(1)(B), and Theriault's ouster was unarguably an adverse employment action. The battleground, then, is the third element, that is, whether Theriault sufficiently demonstrated the requisite causal nexus between her protected activity and her discharge. To demonstrate a causal link sufficient to defeat a summary judgment motion, Theriault must make a sufficient evidentiary showing that her protected activity (her alleged whistleblowing) "was a substantial, even though perhaps not the only, factor motivating [her] dismissal." Caruso v. Jackson Lab., 98 A.3d 221, 226 (Me. 2014) (quoting Walsh, 28 A.3d at 615). Put another way, Theriault must make a sufficient evidentiary showing

- 10 -

that her protected whistleblowing activity was a but-for cause of her dismissal.  See id. at 227.

The parties hotly dispute what evidence of causation should have been considered at the summary judgment stage. Theriault argues that under Maine law a court, when faced with an employer's summary judgment motion in a WPA retaliation case, may consider only the plaintiff's evidence.  Genesis takes a contrary position, contending that the court was obliged to consider all of the evidence (including its evidence about its reasons for terminating Theriault) when determining whether to grant summary judgment.  Because the district court rejected Theriault's understanding of Maine law and instead considered all of the evidence, Theriault exhorts us to find that the court applied (at least functionally) the McDonnell Douglas framework and thus erred.  On its own terms, Theriault's argument fails.[4]

_____

[4] As framed, Theriault's argument presumes that the choice of what framework should be used to analyze a WPA retaliation claim at the summary judgment stage is a matter of state substantive law, not a matter of federal procedure.  While it can be argued that the McDonnell Douglas framework is procedural, see, e.g., Buytendorp v. Extendicare Health Servs., Inc., 498 F.3d 826, 834 (8th Cir. 2007); Snead v. Metro Prop. & Cas. Ins. Co., 237 F.3d 1080, 1094 (9th Cir. 2001), and therefore should have been invoked by the district court when adjudicating the summary judgment motion, Theriault has not advocated that proposition. Consequently, she has waived any such contention, see United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990), and we express no opinion as to whether the McDonnell Douglas framework should be regarded as substantive or procedural.

Some background is helpful to put Theriault's argument into perspective. As a general rule, federal courts employ the McDonnell Douglas burden-shifting framework when analyzing employment retaliation claims at the summary judgment stage. Under that framework, the burden is on the plaintiff to make out a "prima facie case" which requires only "the production of admissible evidence, which, if uncontradicted, would justify a legal conclusion of [retaliation]." Sanchez v. P.R. Oil Co., 37 F.3d 712, 719 (1st Cir. 1994). The burden of production then shifts to the defendant to identify a legitimate reason for the adverse employment action. See Murray, 789 F.3d at 25. Once this minimal burden of production is satisfied, the burden reverts to the plaintiff to show that the proffered reason was not the real reason for the adverse employment action but, rather, was a pretext for retaliation. See id.

In Brady v. Cumberland County, the Law Court shelved the tripartite McDonnell Douglas burden-shifting framework in favor of a singular inquiry: "whether the record as a whole would allow a jury to reasonably conclude that the adverse employment action was motivated at least in part by retaliatory intent." 126 A.3d 1145, 1158 (Me. 2015). When answering this question, Brady directs a trial court to collapse the more intricate McDonnell Douglas framework and, in a seamless inquiry, "recognize any evidence that the employer had a lawful reason for the adverse action taken

- 12 -

against the employee, and any evidence that the proffered reason is merely a pretext." Id. at 1157-58. Still, the Law Court did not regard this change in focus as a sea change in the law. Rather, it anticipated that "the evidence that would be presented in the second and third stages of the McDonnell Douglas framework will still fall within the analytical framework applicable to summary judgment motions in WPA retaliation cases because that evidence still bears on the allegation of causation." Id. at 1158.

The upshot is that when the Brady court shelved the McDonnell Douglas framework, it perforce jettisoned McDonnell Douglas's prima facie case requirement, which it criticized as "limited in . . . effect" and "fall[ing] short of [requiring] a body of evidence that would be sufficient to permit a finder of fact to conclude that the employer acted unlawfully." Id. at 1155. In its place, the court established a new, Maine-specific retaliation paradigm. Under this Maine-specific paradigm, a plaintiff must present evidence of causation up front, not wait for the defendant to introduce evidence of its legitimate reason for terminating her. See id. at 1157. Only if the plaintiff in a WPA retaliation case satisfies this new paradigm will she be able to survive the defendant's motion for summary judgment. See Cormier v. Genesis Healthcare LLC, 129 A.3d 944, 948 n.2 (Me. 2015).

The Law Court has described this Maine-specific retaliation paradigm as embodying a "prima facie case" requirement.  See, e.g., id.  It has made pellucid, though, that "a 'prima facie case' within the meaning of the McDonnell Douglas analysis is different" than the "prima facie case" contemplated under the new paradigm that it has fashioned for adjudicating WPA retaliation cases.  Brady, 126 A.3d at 1155, 1158; see Cormier, 129 A.3d at 948 n.2 (explaining that "the term 'prima facie' merely describes the evidence that 'is sufficient to withstand a motion for summary judgment' generally, rather than a specialized categorization of evidence that does not directly track the three elements of the claim" (quoting Brady, 126 A.3d 1155)).[5]  In the interest of clarity, we refer throughout to the framework articulated by Brady and its progeny as the "Maine-specific retaliation paradigm," not as a "prima facie case" requirement.

Notwithstanding Maine's new paradigm, all roads lead to Rome:  in the final analysis, the Maine-specific retaliation paradigm obligates the plaintiff to adduce precisely the same quantum of proof that she would have had to adduce to defeat summary judgment under the McDonnell Douglas framework.  See Brady,

---

[5] There is a puzzling footnote in Carnicella v. Mercy Hospital, 168 A.3d 768, 772 n.2 (Me. 2017), which refers to the "first of the three steps" in the analytic framework.  But Carnicella is not itself a WPA retaliation case, and in all events the footnote is dictum.  Thus, we do not attempt to decipher the meaning of the Carnicella footnote.

- 14 -

126 A.3d at 1157-58. The proof is simply arranged in a different way. This seems to be what the Law Court meant when it stated that "[e]limination of the burden-shifting process does not limit the scope of the evidence presented in summary judgment motion practice in WPA retaliation cases, when compared to the evidence that would be presented under the McDonnell Douglas model." Id. at 1157. It follows that, "at the summary judgment stage in WPA retaliation cases, the parties are held to the same standard as in all other cases." Id. at 1158.

To be sure, Theriault resists this conclusion. She interprets Brady to mean that a court, faced with a defendant's summary judgment motion in a WPA retaliation case, may consider only the plaintiff's evidence. Theriault's interpretation is incorrect: Brady's new approach simply means that, at summary judgment, "the parties are entitled to present evidence of the reasons for the employer's action, but without any need to follow the McDonnell Douglas burden-shifting structure." Id.

We now come full circle. Once Brady's Maine-specific retaliation paradigm is properly understood, it becomes readily evident that the court below grasped the essence of Brady and was faithful to it, explicitly eschewing any reliance on the McDonnell Douglas framework. See Theriault, 2017 WL 1403162, at *7 n.14. Consistent with Brady, the court focused on whether the record, construed in the light most favorable to Theriault, sufficed to

- 15 -

support an inference "that the adverse employment action was motivated at least in part by protected activity."  Brady, 126 A.3d at 1158.  Under Brady, this was the decisive question. Consequently, we reject Theriault's claim that the district court applied the wrong analytic model and proceed to the substance of the district court's determination.

### B.  **The Merits.**

Having determined that the court below did not employ the McDonnell Douglas framework but, rather, employed the analytic framework prescribed by the Law Court for use in WPA retaliation cases, we turn to the merits of its summary judgment ruling. Following an appraisal of the record as a whole, we agree with the district court that Theriault has failed to adduce sufficient evidence to make out a genuine issue of material fact on causation. We explain briefly.

Theriault claims, in essence, that during the course of RiverRidge's investigation into her alleged misconduct, its motivations changed from legitimate to retaliatory when she complained about Wagner's texting.  Building on this foundation, she says that this retaliatory motive prompted her firing.  This finding of causation, Theriault suggests, can be supported in three ways.  We examine her three suggestions sequentially.

To begin, Theriault argues that the close temporal relationship between her November 21 "texting" complaint against

Wagner and her firing a few days later is enough, in and of itself, to warrant an inference of causation.[6]  The case law repudiates this argument: while Theriault's dismissal followed closely on the heels of her protected activity, "that fact, standing alone, is not enough to trigger an inference of causation" that will withstand summary judgment.  Kearney, 316 F.3d at 23.  Though temporal proximity may be sufficient to satisfy the first element of the McDonnell Douglas framework, see Murray, 789 F.3d at 25 (citing Stanley v. Hancock Cty. Comm'rs, 846 A.2d 169, 175 (Me. 2004)), it is not sufficient, by itself, to forge a causal link strong enough to create an inference of causation and thus satisfy Brady's new, Maine-specific retaliation paradigm in the face of an employer's asserted legitimate non-retaliatory reason for the adverse employment action.

Theriault disagrees, relying principally on the Law Court's decision in Cormier.  That reliance is mislaid.  In Cormier, the Law Court determined that temporal proximity between the protected activity and the adverse employment action could create a triable issue of fact as to whether Cormier's employer

_____

[6] Here, the temporal relationship upon which Theriault's argument depends is undermined to some extent by the fact that RiverRidge suspended Theriault for her reported actions and comments before Theriault made any complaint about Wagner's alleged texting.  For summary judgment purposes, however, we assume that the relevant temporal relationship was between Theriault's protected activity and her firing without regard to the timing of her suspension.

knew about her protected activity. See Cormier, 129 A.3d at 951. The Law Court went on to say, however, that the "combined effect" of temporal proximity and other evidence — not temporal proximity only — could give rise to an inference of causation sufficient to withstand summary judgment. Id.

This holding is consistent with earlier Maine cases. See, e.g., Stanley, 864 A.2d at 174-77 (upholding summary judgment for employer even though employee was terminated "a short time after" making his complaint); Doyle v. Dept. of Human Servs., 824 A.2d 48, 56 (Me. 2003) (upholding summary judgment for employer notwithstanding "close proximity" between protected activity and adverse employment action); DiCentes v. Michaud, 719 A.2d 509, 514-15 (Me. 1998) (acknowledging that close temporal proximity between protected activity and adverse employment action does not end the matter). It is also consistent with federal case law. See, e.g., Murray, 789 F.3d at 26; Mariani-Colon v. Dep't of Homeland Sec., 511 F.3d 216, 224 (1st Cir. 2007); Kearney, 316 F.3d at 23. Finally, it is consistent with the way in which WPA retaliation cases are litigated under Maine law: on a "summary judgment motion — just as at trial — the employee must not only produce evidence that she engaged in protected activity and later suffered an adverse employment action, but in the first instance she must also produce some evidence of the employer's unlawful motivation." Brady, 126 A.3d at 1156. If the employer puts forth

- 18 -

evidence of a legitimate non-retaliatory reason, the employee must adduce some evidence that the employer's proffered reason is pretextual.

Next, Theriault argues that there was evidence in the record from which a jury could find her employer's stated reasons for firing her pretextual. This argument amounts to nothing more than a post-hoc rationalization.

A plaintiff may show pretext by establishing "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons" for the challenged employment action. Cookson v. Brewer Sch Dept., 974 A.2d 276, 282 (Me. 2009) (quoting Billings v. Town of Grafton, 515 F.3d 39, 55-56 (1st Cir. 2008)); see Trott v. H.D. Goodall Hosp., 66 A.3d 7, 15 (Me. 2013). Here, Theriault asserts that even if she grabbed the resident by the front of his shirt, the incident would not have amounted to abuse and, thus, could not have justified RiverRidge's decision to cashier her. She reasons that because a trier of fact could conclude that the incident did not amount to abuse, the trier likewise could conclude that RiverRidge's claim that it dismissed her based on the incident was pretextual.

Leaving to one side the fact that the "shaking" incident was not the sole reason for Theriault's dismissal, there is something to be said for Theriault's premise. As Theriault

- 19 -

suggests, the evidence may be such as to create a factual dispute about whether patient abuse actually occurred. But the conclusion that Theriault would have us draw from this premise — that a finding of pretext would likewise be permissible — does not follow. "[E]vidence of a decisionmaker's mistaken judgment is not dispositive of the question of pretext unless that evidence would permit the factfinder to conclude that the stated nondiscriminatory justification for the adverse employment action was either knowingly false or made in bad faith." Murray, 789 F.3d at 27; see Fuhrmann v. Staples Office Superstore E., 58 A.3d 1083, 1093 (Me. 2012). There is nothing in the summary judgment record that would allow a factfinder to conclude that the decision to fire Theriault for perceived misconduct was either knowingly false or undertaken in bad faith. Theriault admits that she grabbed the resident by the shirt (although she claims that she did so to prevent him from falling). Other witnesses, though, reported that it appeared to them that Theriault had grown frustrated with the resident and had grabbed his shirt to shake him. There is not a shred of evidence that would support an inference that RiverRidge acted inappropriately in resolving this conflict by crediting the account of a neutral witness (Vasquez).[7]

---

[7] Indeed, Theriault herself does not contend that Vasquez lied. She only contends that Vasquez mis-judged the intent behind Theriault's actions.

Theriault cannot make out a genuine issue of material fact with respect to pretext simply by challenging the "objective veracity" of an employer's conclusions.  Morgan v. Mass. Gen. Hosp., 901 F.2d 186, 191 (1st Cir. 1990).

It is true, of course, that DHHS eventually concluded that no patient abuse occurred.  It does not follow, though, that RiverRidge acted in bad faith in concluding that Theriault's actions were inappropriate.  Theriault has identified no facts that contradict Genesis's basic defense:  that RiverRidge administrators conducted an investigation into the allegations of misconduct made against Theriault, found those allegations to be substantiated in material part, and based the decision to terminate her employment on that finding.  See Kearney, 316 F.3d at 23 (attributing decretory significance to employee's failure to discredit employer's investigative process).

If more were needed — and we doubt that it is — Moore's request for authorization to discharge Theriault also cited Theriault's inappropriate comments, which threatened harm to residents.  The comments themselves are jarring.  Theriault once asked a nurse for a gun "to handle" a resident; on another occasion, she asked for a baseball bat to use on a different resident; and on yet a third occasion, she told a resident's family that she had a "noose and a bucket" ready for his use.  Theriault attempts to minimize these statements by saying that they were

- 21 -

made in jest and, thus, could not have grounded a good-faith decision to fire her.

Theriault's appraisal is incorrect. It is common ground that inappropriate statements may constitute a basis on which to terminate an employee even if supposedly made in jest. See Pina v. Children's Place, 740 F.3d 785, 797 (1st Cir. 2014). Words can be hurtful, see, e.g., Franchina v. City of Providence, 881 F.3d 32, 37 (1st Cir. 2018), and a speaker's demurrer that she was "just kidding" does not lessen the harm that inappropriate statements may have caused, see Pina, 740 F.3d at 797. Here, for example, Wagner reported that Theriault's "noose and a bucket" statement, when uttered, was very upsetting to the resident's family. Although Theriault may have thought these comments humorous, she has adduced no evidence to suggest that RiverRidge acted in bad faith when it found them far out of line and determined that the comments, together with the shaking incident, warranted Theriault's dismissal.

Theriault's final argument rests on a claim of disparate treatment: she posits that the fact that she was terminated and Wagner was not is sufficient to ground an inference of pretext. In support, she cites cases holding that pretext may be inferred from proof that similarly situated employees were treated differently. See, e.g., Murray, 789 F.3d at 27; Conward v. Cambridge Sch. Comm., 171 F.3d 12, 20 (1st Cir. 1999). The rub,

however, is that a jury could not find Theriault and Wagner to have been similarly situated.

The relevant question is whether a reasonable person, looking objectively at the two incidents, would think them roughly equivalent and the two employees similarly situated. See Ray v. Ropes & Gray LLP, 799 F.3d 99, 114 (1st Cir. 2015). Wagner was accused of texting on her cell phone while distributing medications; Theriault was accused of shaking a resident and making inappropriate comments about inflicting harm on residents. The allegations against Wagner were made by Theriault, denied by Wagner, not corroborated by any third party, investigated by the employer, and found to be apocryphal. By contrast, the allegations against Theriault, though originally made by Wagner, were confirmed by the employer's investigation, largely admitted by Theriault, and corroborated in part by a neutral party (Vasquez). Comparing these two situations is like comparing eels to elephants — there are many more differences than similarities. See Morgan, 901 F.2d at 191. Thus, the fact that Wagner's employment continued while Theriault's did not does not aid Theriault's quest to prove that RiverRidge's stated reasons for her termination were pretextual.

To sum up, Theriault has attempted to discredit her employer's stated reasons for terminating her, but she has not succeeded in impugning them. "Casting aspersions is not enough."

Murray, 789 F.3d at 27. As both the Law Court and this court agree, "an employee's assertion of . . . animus on the part of an employer will not survive summary judgment if she or he relies on mere 'conclusory allegations, improbable inferences, and unsupported speculation.'" Cookson, 974 A.2d at 283 (quoting Feliciano de la Cruz v. El Conquistador Resort & Country Club, 218 F.3d 1, 5 (1st Cir. 2000)). RiverRidge's reasons have remained plausible, consistent, and coherent. The mere fact that Theriault made a complaint about Wagner shortly before Theriault's ouster does not shield her from the consequences of her own actions. See Blackie v. Maine, 75 F.3d 716, 723-24 (1st Cir. 1996) (explaining that "by engaging in a protected activity, an employee does not acquire immunity from the same risks that confront virtually every other employee every day in every work place"). On this record, Theriault has pointed to no significantly probative evidence adequate to support a finding that a causal connection existed between her protected activity and her dismissal.

## III. CONCLUSION

We summarize succinctly. The district court faithfully followed the teachings of the Law Court, applied that court's new, Maine-specific retaliation paradigm to Theriault's WPA retaliation claim, and granted summary judgment in favor of Genesis. Bearing in mind that the issue of whether the McDonnell Douglas framework applies to a WPA retaliation claim in a diversity case is not

before us, <u>see</u> <u>supra</u> note 4, we discern no error either in the district court's analysis or in its evaluation of the summary judgment record.

We need go no further.  The entry of summary judgment in favor of Genesis is

**<u>Affirmed</u>.**