# United States Court of Appeals

## For the First Circuit

No. 19-1696

MATTHEW J. WHITE,

Plaintiff, Appellant,

v.

HEWLETT PACKARD ENTERPRISE COMPANY,

Defendant, Appellee,

and

HEWLETT-PACKARD COMPANY; HP INC.,

Defendants.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

[Hon. D. Brock Hornby, U.S. District Judge]

Before

Lynch and Barron, Circuit Judges,
and Burroughs,[*] District Judge.

Danielle Quinlan, with whom White & Quinlan, LLC was on brief,
for appellant.
Melinda J. Caterine, with whom Timothy J. Powell, Littler
Mendelson, P.C., and Ankur Vijay Desai were on brief, for appellee.

---

[*] Of the District of Massachusetts, sitting by designation.

January 13, 2021

**LYNCH**, <u>Circuit Judge</u>.  The district court entered summary judgment against Matthew White and for his former employer, Hewlett Packard Enterprise, on his claims based on Maine employment law.  That court held that controlling Maine Law Court decisions meant White's claims for accrued vacation pay and bonus pay were without merit, and it rejected his remaining claims for equitable relief.  We agree and affirm the district court's grant of summary judgment.

## I.    Background

A. <u>Factual Background</u>.

White worked for Hewlett Packard (now Hewlett Packard Enterprise, and collectively "HP") in Kennebunk, Maine, as a "Datacenter Interoperability Architect" (DIA) and later "Data Center Architect" (DCA) from February 2013 until July 2015, when he voluntarily resigned.

### HP's Employment Offer

The terms of White's employment were first set out in an offer letter, which stated that White would be subject to HP's personnel policies concerning benefits, vacation time, and compensation if he accepted the employment offer.  It included a link to HP's benefits page on HP's internal intranet, and stated "[u]pon your hire, you will be eligible to participate in the benefit programs offered by the Company to its similarly situated employees.  These and any other benefit programs are subject to

modification from time to time."  HP's[1] 2013 Benefits Policy stated:

> Employees are strongly encouraged to use all of their vacation each year -- to take time away to refresh, recharge, and enjoy life outside of work.  The vacation program does not include a year-end carryover feature or a payout provision if you leave the company, so <u>any time you don't use during the calendar year will generally be lost on December 31</u> (some exceptions apply based on state laws in California, Illinois, Montana, and Nebraska and for hourly-paid [nonexempt] employees governed by the McNamara-O'Hara Service Contract Act [SCA]).  For more information, see "If you don't use all your vacation time each year" later in this section.

A separate heading, titled "If you leave HP or go on disability or leave," warned that "[i]f you leave HP for any reason, either voluntary or involuntary, you will not receive pay in lieu of unused vacation.  Unless your primary work location is in California, Illinois, Massachusetts, Montana, or Nebraska or you are an hourly-paid (nonexempt) employee governed by the McNamara-O'Hara Service Contract Act (SCA), all unused vacation will be forfeited at the time of your separation."

White states that he "likely" asked questions about his benefits package before accepting his offer, but there is no evidence that he asked about his vacation benefits.  He also

---

[1]     Shortly after White left, HP reorganized into two separate companies: HP, Inc. and HP Enterprise Company (HPE).  HPE is the successor organization for the divisions that employed White, and so is named as a defendant in this suit.

acknowledges that he had access to the benefits portal for the entire period of his employment with HP, although White was sometimes frustrated by technical problems with HP's intranet system. HP renewed its benefits policy yearly, and issued employees a summary of material changes. The terms of the vacation policy provision and the forfeiture provision remained substantively unchanged during White's period of employment.

The terms of White's compensation were also set out in the offer letter. On top of his base pay and incentive pay,[2] HP offered limited-duration bonus programs. HP's compensation policy defined a bonus program as "a sales result, achievement-based incentive program with a specified beginning and end date which is offered to a defined sales population to meet a certain sales focus." Sales teams could be eligible to participate in a number of bonus programs at any given time.

### White's Initial Assignment to the DIA Team

When he joined HP in February 2013, White worked in HP's Enterprise group. White was a member of the DIA team, which educated "senior level customers" -- typically large US companies -- as well as other HP employees about HP server products,

---

[2] When White started, he was paid a base salary of $190,400 per year and a $50,000 signing bonus (paid in increments over three years). White was also eligible to earn incentive compensation based on yearly sales targets and to participate in bonus programs. If White met his incentive targets, his total compensation before special bonus programs was $238,000.

particularly "blade servers."  In 2013, HP was increasingly worried about losing blade server market share to its fastest-growing competitor, Cisco.  White states he was hired "for the specific purpose of reducing Cisco (HP's top server market competitor) market share in the server business."

**The 1H Cisco Market Share Bonus Program during the First Half of Fiscal Year 2014**

On November 11, 2013, White received an email from the HP Sales Operations Team with the subject line "New Bonus Opportunity."  The email announced the Market Share Bonus Program for the first half of HP's 2014 fiscal year (running from November 1, 2013 to April 30, 2014).  The email stated:

> This bonus is to reward the DIA team for specific changes to the Cisco X86 US Blade Unit Market Share based upon quarter over quarter calendar quarter results as reported by IDC.  Please take a moment to review all program details in the Approved Bonus Programs site.  In the Search Field, you can search by bonus ID number or by Sales plan number.  Contact your manager if you have any questions concerning eligibility or the bonus program.  All bonus programs are governed by the HP Sales Compensation Global Policy and HP Sales Bonus Terms and Conditions.

The Market Share Bonus Program measured and rewarded HP's success at reducing or slowing the growth in Cisco's market share.  Through the program White was eligible to receive up to a $10,000 bonus for each quarter that the DIA team either slowed the increase in Cisco's market share in the blade server business, or

successfully reduced Cisco's market share in the blade server market. Smaller reductions in Cisco's market share would result in lower bonuses. HP used the "final IDC Final X86 US Blades unit market share results" -- a third-party, publicly available metric of server market share -- to calculate whether the DIA team qualified for the bonus. The bonus portal described the Market Share Bonus Program as "a team goal and dependent upon the IDC Final X86 US Blades unit market share results, calendar quarters." Under "Program Award Structure" it stated, "[a]ll quarters are based upon calendar quarter, not HP fiscal quarter. All results are based upon QoQ [Quarter over Quarter] with the starting baseline of the 3Q13 (calendar quarter)."

Because IDC's reports tracked market share by calendar quarter, not HP's fiscal quarter, the bonus period did not exactly match the market share reporting period. The bonus period covering the first and second HP 2014 fiscal quarters (November 1, 2013 to April 30, 2014) was tied to publicly reported market share for the fourth calendar quarter of 2013 and the first calendar quarter of 2014 (October 2013 through March 2014).

The Sales Compensation team believed that this somewhat complicated structure -- where bonuses were paid per fiscal quarter, but the performance metrics were calculated by calendar quarter -- was unavoidable. HP calculated compensation per fiscal quarter but it relied on IDC for its market share data, in part

because this metric was used by HP's competitors. IDC only offered market share data on a calendar quarter basis. HP's Rule 30(b)(6) deponent, Scott Powell, testified that the Sales Compensation team decided against using the IDC calendar quarter data to estimate changes in market share by fiscal quarter because there were a number of different methodologies that they could use to do this, and the team was concerned that any particular method they used would be seen by eligible employees as arbitrary. The DIA team management participated in negotiating the terms of the bonus programs, and won concessions from the Sales Compensation team.

**The 2H Cisco Market Share Bonus Program Covering May 2014 to October 2014**

HP renewed the Cisco Market Share Bonus Program for the second half of 2014. That program ran for HP 2014 fiscal quarters three and four (May 2014 to October 2014) and tracked calendar quarters two and three (April 2014 to September 2014).[3] The terms of this program were also available via the HP bonus portal. The portal page stated:

> Program Name: (14.357) 2H US DIA Team Market Share Bonus . . .
>
> Program Start Date: 2014-05-01 . . .
>
> Program End Date: 2014-10-31 . . .

_____

[3]   Based on IDC's official market share data, the DIA team did not qualify for a bonus for the third calendar quarter in 2014. HP nonetheless paid $1,000 bonuses to the team because its internal sales data showed that IDC underestimated HP's market share for that quarter.

- 8 -

Program Eligibility Details: Only DIA team is eligible for this program, including DIA Director. Team members must be active employees on the DIA team on a valid sales plan for the full calendar quarter to qualify for payout. Bonus periods are based upon Calendar Quarter results through IDC.

Participants Registration Steps: . . . No registration is required. This is a team goal and dependent upon the IDC Final X86 US Blades unit market share results, calendar quarters.

Program Award Structure: All results are based upon final IDC Final X86 US Blades unit market share results. All quarters are based upon calendar quarter, not HP fiscal quarter.

White "do[es] not recall" whether or not he accessed the bonus portal for either Market Share Bonus Program. HP did not renew the Market Share Bonus Program, so October 2014 was the last month that the program was active.

**The 2014 and 2015 Sales Letters**

On April 3, 2014, White also received the 2014 "Sales Letter," which set the terms for sales team compensation for the period of March 2013 to October 2014. HP yearly issued a "Sales Letter" that set incentive targets and sales metrics. The Sales Letter gave the employee fifteen days to accept the new terms, or to raise any concerns with the employee's manager and the Sales Compensation team. It stated:

"[t]his Sales letter is considered accepted after 15 calendar days unless you notify Hewlett-Packard in writing otherwise, except as provided by local requirements. In

accepting, you represent that you have read, understood and agreed to the content and terms and conditions of your Sales plan, including this Sales letter and all referenced policies."

Page three of the letter pointed employees to the "Approved Sales Bonus Programs Portal," for "[a]dditional information and policies."[4] White either actively or passively accepted the April 2014 Sales Letter. White also received a similar letter on February 2, 2015, for the HP 2015 fiscal year.

**HP Disbands the DIA Team in October 2014**

In October 2014, HP disbanded the DIA team, and reassigned the employees in that group. HP states it did so because of changing technology and changing sales priorities. White was reassigned to the DCA team, which focused on promoting a different range of HP products to major institutional clients.

Despite the DIA team being disbanded, Cisco nonetheless lost significant blade server market share in the fourth calendar quarter of 2014. Because the Market Share Bonus Program was not in effect under the terms listed on the bonus portal, no employees who had been former DIA team members received bonuses for this decline in Cisco market share.

---

[4] White stated in his deposition that he "d[id] not recall seeing" the link to the bonus portal in his HP fiscal year 2014 Sales Letter. But White has produced no evidence to challenge the authenticity of the Sales Letter HP provided. We accept that the Sales Letter provided by HP is an accurate reflection of the letter that White received.

- 10 -

White points to a number of conversations he had with HP employees as evidence that there was significant confusion over the terms of the Market Share Bonus Program, and whether it had in fact ended. He notes, for example, that his former DIA supervisor, Joey Vidal, asked the Sales Compensation team whether DIA team members would be receiving the bonuses, and asked to speak with the Sales Compensation team about the bonus program. White does not contend that any member of the team received a market share bonus from the disbanded program.

White also does not identify any communication where he was promised a Cisco Market Share bonus tied to the fourth calendar quarter of 2014. Instead, White admits that he was generally unaware of the terms of the bonus program. He testified:

> There wasn't a lot of time to keep up with bonus programs. I kn[ew] that the [Market Share bonus] program was available . . . [and] there was talk of it during team meetings, and there was also talk of it that we met the objective number for the last period that we were -- you know, that year or that period of time that we were working in that capacity at HP.

He also stated, "there was internal discussion [about the Market Share Bonus Program] that I believe I did not keep track [of], I was probably told in a group conversation that those metrics were released and, in fact, we had earned the highest tier of that IDC number." White also points to text and email conversations he had

with coworkers about the program, where some former DIA members expressed confusion about the Market Share Bonus Program.

**White Resigns**

On July 3, 2015, White voluntarily resigned. White asked HP when he would be paid for his unused accrued vacation time.[5] In response, HP sent White a memorandum referring him to its intranet page for departing employees. That page explained that departing employees in most states forfeited their unused vacation days under the terms of HP's benefits policy. Maine was not included in the list of exempt states. White states he was surprised that Maine was not included on the list of exempt states, and he thought that Maine had been one of the exempt states under similar vacation policies issued by his past employers.

B. Relevant Procedural History.

In 2017, White sued HP, claiming that he should receive compensation for his unused vacation days under Maine law, and that HP owed him a bonus payment under the Market Share Bonus Program for the period from October to December 2014. White largely relied on Me. Stat. tit. 26, § 626, arguing that that statute gave him a right to receive compensation for his unused

---

[5] White does not dispute on appeal having received HP's vacation policy with his offer letter, and he now acknowledges that the vacation policy was available to him on HP's intranet system at any time. But he states he "d[id] not know" that HP "had a vacation policy in place when [he left]" the company.

- 12 -

vacation time on the facts of this case, and a right to collect bonus pay under the Market Share Bonus Program for the period of October to December 2014. In the alternative, he argued he should receive bonus pay under a theory of quantum meruit or unjust enrichment. White also raised other claims not relevant to this appeal. HP moved for summary judgment, and the parties submitted competing statements of material facts.

On June 11, 2019, the district court granted summary judgment in HP's favor. The district court found that section 626 did not displace the terms of White's employment agreement with HP because the Maine Law Court has rejected precisely the claim that White makes here. The district court rejected White's quantum meruit and unjust enrichment claims relating to the bonus pay because it found there was a valid contract between White and HP that precluded recovery under these equitable theories. Separately, the district court commented that "I have spent an inordinate amount of time deciphering the record as the parties presented it in their dueling statements of material fact. . . . [T]he dueling statements are so argumentative, lengthy, and full of qualifications, objections, and requests to strike that they are basically unusable." Rather than rely on the statements of material facts, the district court "focused directly on the plaintiff's deposition and affidavit and the defendant's 30(b)(6) deposition." White brought this timely appeal.

- 13 -

## II. Discussion

White argues the district court erred in finding that Maine law does not create a substantive right to compensation for unused vacation time on the undisputed facts here.[6] He also argues that Maine equitable doctrine obligates HP to pay him a Market Share bonus for the fourth calendar quarter of 2014. Finally, White claims the district court failed to fully consider the summary judgment record by setting aside the parties' statements of material facts, and erred by allowing HP to supplement its document disclosures after the close of fact discovery. We affirm the district court's grant of summary judgment.

"[S]ummary judgment is proper 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled

---

[6]    Having lost at the trial court on his proffered arguments, White now argues for the first time on appeal that we should certify all questions of Maine law to the Maine Law Court. Because this argument was not raised to the district court it is waived. Wood v. Milyard, 566 U.S. 463, 470 (2012) ("It is hornbook law that theories not raised squarely in the district court cannot be surfaced for the first time on appeal." (quoting McCoy v. Mass. Inst. of Tech., 950 F.2d 13, 22 (1st Cir. 1991))). Even if not waived, it is meritless because Maine law is clear on the issues raised in this appeal. Nieves v. Univ. of P.R., 7 F.3d 270, 274–75 (1st Cir. 1993) ("Before [the] discretionary decision [to certify] is even considered . . . we must first undertake our own prediction of state law for we may conclude that 'the course [the] state court [ ] would take is reasonably clear.'" (fourth and fifth alterations in original) (quoting Porter v. Nutter, 913 F.2d 37, 41 n.4 (1st Cir. 1990))).

to a judgment as a matter of law.'" <u>Celotex Corp.</u> v. <u>Catrett</u>, 477 U.S. 317, 322 (1986) (quoting Fed. R. Civ. P. 56(c)).  This court "review[s] an order for summary judgment de novo, evaluating the facts and all reasonable inferences therefrom in the light most flattering to the nonmoving party." <u>Nieves-Romero</u> v. <u>United States</u>, 715 F.3d 375, 378 (1st Cir. 2013).  To survive summary judgment, the non-moving party must produce evidence "that, if it is credited, [would permit] a factfinder . . . [to] resolve the case in favor of the nonmovant." <u>Theriault</u> v. <u>Genesis HealthCare LLC</u>, 890 F.3d 342, 348 (1st Cir. 2018) (quoting <u>Murray</u> v. <u>Kindred Nursing Ctrs. W. LLC</u>, 789 F.3d 20, 25 (1st Cir. 2015)).  This court reviews the district court's management of the discovery process only for abuse of discretion. <u>Fennell</u> v. <u>First Step Designs, Ltd.</u>, 83 F.3d 526, 530 (1st Cir. 1996).

A. <u>Under Maine law White has no right to pay for unused vacation time except as provided for in his employment agreement</u>.

Me. Stat. tit. 26, § 626 states: "An employee leaving employment must be paid in full no later than the employee's next established payday. . . . [And] [w]henever the terms of employment or the employer's established practice includes provisions for paid vacations, vacation pay on cessation of employment has the same status as wages earned."  On that basis, White argues that under Maine law his accrued vacation must be treated as wages, and so should have been paid in full.  !

- 15 -

We disagree. The Maine Law Court's decision in _Richardson_ v. _Winthrop School Department_, 983 A.2d 400 (Me. 2009), is controlling. In _Richardson_ the plaintiff had accumulated approximately 178 days of vacation time when his employment ended, but forfeited all but 30 days of vacation time under the terms of a forfeiture provision in his employment contract. _Id._ at 401. Richardson sued and argued, just as White does, that his accrued vacation time should be treated as wages under section 626. _Id._ at 403. The Maine Law Court rejected this argument. It stated: "the [employment] Contract is unambiguous. Despite Richardson's contentions, the plain language of [the forfeiture provision] clearly limits his entitlement to vacation pay upon retirement to thirty days. Richardson's argument to the contrary would read [that provision] out of the Contract." _Id._ The Maine Law Court held that under section 626 "a former employee may only claim what is owed according to the terms of the employment agreement; section 626 does not modify or supersede its terms." _Id._ at 402.

_Richardson_ addresses the same type of claim as White's. The employment agreement in _Richardson_ required the employee to forfeit vacation time he had accrued. The Maine Law Court held that section 626 did not change the terms of this forfeiture provision. To the contrary, it emphasized, "[a]lthough section 626 creates a statutory right for former employees to _seek_ payment,

- 16 -

entitlement to payment is governed solely by the terms of the employment agreement." Id.

The Maine Law Court's decision in Richardson is consistent with its earlier opinion in Rowell v. Jones & Vining, Inc., 524 A.2d 1208 (Me. 1987), which held section 626 does not create a substantive right to payment for unused vacation time "at the cessation of employment" except as provided for in the employment contract. Id. at 1210-11.

White claims Richardson is distinguishable because the plaintiff in that case accrued his vacation time over a longer period than White did, and because in Richardson some of that vacation time had rolled over from past years -- something White's employment contract prohibits. In Richardson, the plaintiff worked for his employer for seventeen years, 983 A.2d at 401, whereas White worked for HP for two. But the Maine Law Court did not rest any portion of its analysis on the length of Richardson's employment, or the fact that portions of his vacation time had rolled over from earlier employment contracts. Nor is there any language in section 626 or case law from Maine that indicates that those factors would be relevant. We conclude that Maine law is clear on this point: section 626 does not create substantive employment rights, so the terms of HP's vacation policy control.

B. White's bonus compensation claims are meritless.

White next argues that he is entitled to a $10,000 Market Share bonus for the fourth calendar quarter of 2014. It is undisputed that the Market Share Bonus Program was no longer in effect at that time, and that White was no longer on the DIA team. White argued to the district court that under section 626 the bonus should be treated as "wages" that "must be paid in full." White does not brief this issue on appeal, so this argument is waived. Rife v. One W. Bank, F.S.B., 873 F.3d 17, 19 (1st Cir. 2017).[7]‼

But White does maintain on appeal that based on his confusion theory[8] he should receive bonus compensation under

_____

[7]    In any event, White's section 626 claim over bonus compensation is meritless. As with the vacation time claim, the Maine Law Court has made clear that section 626 cannot create a substantive right to incentive pay or other compensation when prohibited by the employer's policy. Burke v. Port Resort Realty Corp., 714 A.2d 837, 839 (Me. 1998) ("The employment agreement, not section 626, governs how wages are earned and, if specified, when wages are to be paid."). Section 626 is intended only to give employees the right to enforce the terms of their employment agreement. Id. White acknowledges that he "actively or passively" accepted the terms of the bonus program, and that he was not eligible for the Market Share bonus under those terms. Because White is not eligible for the Market Share bonus under the terms of his employment agreement, he cannot recover under section 626.

[8]    White claims that the program was purposefully confusing, management gave the impression that the team would be receiving the bonuses, and he performed the work to earn the Market Share bonus on the assumption that it would be available. He does not point to any promise by HP to pay the Market Share bonus for that period, so his claim is limited to this "confusion theory."
       White also claims in his brief to this court that the summary judgment record contained evidence that "HP intentionally made its bonus programs so confusing that management did not

equitable theories of quantum meruit and unjust enrichment. We disagree. At the outset, White's unjust enrichment claim fails because of his contractual relationship with HP. "Unjust enrichment describes recovery for the value of the benefit retained <u>when there is no contractual relationship</u>, but when, on the grounds of fairness and justice, the law compels performance of a legal and moral duty to pay." <u>Aladdin Elec. Assocs.</u> v. <u>Town of Old Orchard Beach</u>, 645 A.2d 1142, 1145 (Me. 1994) (emphasis added) (quoting <u>A.F.A.B., Inc.</u> v. <u>Town of Old Orchard Beach</u>, 639 A.2d 103, 105 (Me. 1994)). White plainly had a contractual relationship with HP, and so cannot maintain an unjust enrichment claim.

A contractual relationship does not necessarily bar quantum meruit recovery. As this court has previously stated, under Maine law quantum meruit recovery may be available alongside contractual remedies when the services at issue are outside of the scope of the contract, or in "circumstances that render the contract inoperative." <u>Hodgkins</u> v. <u>New England Tel. Co.</u>, 82 F.3d 1226, 1232 (1st Cir. 1996); <u>see also</u> <u>Uncle Henry's Inc.</u> v. <u>Plaut Consulting Co. Inc.</u>, 399 F.3d 33, 46 (1st Cir. 2005); <u>Runnells</u> v. <u>Quinn</u>, 890 A.2d 713, 716-17 (Me. 2006) (contractor could seek quantum meruit recovery for work completed on the basis of an oral

understand its terms." But he cites to no evidence supporting this proposition.

- 19 -

agreement made in addition to a written contract). White has presented no such evidence here. White's sales support work fell squarely within his employment agreements. White has not pointed to any work that he performed outside of his roles on the DIA or DCA teams. White accepted the terms of his employment according to the manner HP set out in its offer. He cannot recover under a theory of quantum meruit for work that is directly addressed by his employment contract. Hodgkins, 82 F.3d at 1232.

C. The district court was well within its discretion to permit HP to produce an additional document before summary judgment.

White also takes issue with the district court's decision to permit HP to supplement its document production. This court reviews the district court's discovery orders for abuse of discretion. In re Subpoena to Witzel, 531 F.3d 113, 117 (1st Cir. 2008). We reverse the district court only on a showing of "manifest injustice." Id. (quoting Saldana-Sanchez v. Lopez-Gerena, 256 F.3d 1, 8 (1st Cir. 2001)). In this case, White complains that HP was permitted to attach a copy of the 2015 vacation policy and certain deposition transcripts to the summary judgment motion, even though those documents were not previously provided. These challenges are meritless. The 2015 vacation policy that HP provided at summary judgment was substantively identical to other versions which HP had provided, and HP included these documents after a request from White that it do so. In these

circumstances, the district court was well within its discretion to permit HP to submit the 2015 version of its vacation policy.

D. The district court did not abuse its discretion in its comments about the parties' statements of material facts.

The district court's comments about the parties' statements of material facts are well-supported, and in any event, there is no evidence that the district court ignored any portion of the record. Cf. Martinez v. Petrenko, 792 F.3d 173, 180 (1st Cir. 2015) ("[A] district court should consider the full record, including affidavits and interrogatories, when considering a motion for summary judgment."). The district court committed no error by giving little weight to the statements of material facts in this case.

The judgment of the district court is affirmed.